# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME JOSE MENDOZA,<br><br>                         Plaintiff,<br><br>v.<br><br>CAROLYM W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                         Defendant. | Case No.:  16cv1603-AJB(KSC)<br><br>**REPORT AND RECOMMENDA-**<br>**TION RE PLAINTIFF'S MOTION**<br>**FOR REMAND OR REVERSAL AND**<br>**DEFENDANT'S MOTION FOR**<br>**SUMMARY JUDGMENT**<br><br>**[Doc. Nos. 10 and 13.]** |

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying him disability and supplemental security income benefits.[1] [Doc. No. 1.]

---

[1]    Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . .  The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

1

1      Presently before the Court are: (1) plaintiff's Motion for Reversal and/or Remand

2  [Doc. No. 10]; (2) defendant's Motion for Summary Judgment and Opposition to

3  plaintiff's Motion for Summary Judgment [Doc. No. 13]; and (3) the Administrative

4  Record ("AR") [Doc. No. 8].

5      After careful consideration of the moving and opposing papers, as well as the

6  Administrative Record and the applicable law, it is RECOMMENDED that the District

7  Court DENY plaintiff's Motion for Reversal and/or Remand [Doc. No. 10] and GRANT

8  defendant's Motion for Summary Judgment [Doc. No. 13].

9  *I.*    **_Background and Procedural History_**.

10      On February 25, 2013, plaintiff applied for disability insurance benefits and

11  supplemental security income benefits claiming he was unable to work as of May 9,

12  2009. [AR 153-169.] At the time of his application, plaintiff reported that he was unable

13  to work because of a cervical spine injury and numbness and pain in his right shoulder

14  and arm. [AR 181.] The field office interviewer made the following notations in a

15  Disability Report prepared at the time when plaintiff submitted his application:

16  "Claimant . . . had difficulty standing and sitting during [the] interview due to cervical

17  spine injury. He walked slowly and he could [not] use his right arm/hand too well due to

18  numbness/pain, etc. He kept trying to stretch during [the] interview to relieve pain while

19  sitting and standing." [AR 178.] Plaintiff's application also indicates he had been taking

20  a number of medications for pain, muscle spasms, and sleep problems. [AR 184.]

21      On April 24, 2013, plaintiff completed a work history form stating that he worked

22  as a refinish painter at a photo copier company from 1996 to 1997. From June 1999

23  through October 2006, plaintiff worked as a supervisor in the shipping and receiving

24  department of a ship re-building and furniture company. In 2008 and 2009, plaintiff

25  worked as a painter at a shipbuilding company. [AR 195-200.]

26      On June 6, 2013, plaintiff's claim for disability and supplemental security income

27  was denied because it was determined based on the medical records submitted in support

28  of the claim that his condition was not severe enough to prevent him from working. [AR

16cv1603-AJB(KSC)

90-93.] Plaintiff requested reconsideration, but his request was denied on December 31, 2013. [AR 99-103.] On January 26, 2014, plaintiff requested a hearing before an Administrative Law Judge (ALJ). [AR 111.]

A hearing before an ALJ was held on January 26, 2015. [AR 29, 124.] On February 27, 2015, the ALJ issued a written opinion concluding that plaintiff did not qualify for disability insurance benefits or supplemental security income under the SSA. [AR 10-21.] On March 10, 2015, plaintiff requested review of the ALJ's decision by the Appeals Council. [AR 5.] However, on April 25, 2016, the Appeals Council denied plaintiff's request for review. [AR 1-3.] Plaintiff then filed his Complaint in this action on June 23, 2016. [Doc. No. 1.]

## II. *Standards of Review – Final Decision of the Commissioner.*

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Summary judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary

16cv1603-AJB(KSC)

material in the form of affidavits, depositions, answers to interrogatories, and admissions. In Social Security appeals, however, the Court may 'look no further than the pleadings and the transcript of the record before the agency,' and may not admit additional evidence. *Morton v. Califano*, 481 F.Supp. 908, 914 n. 2 (E.D. Tenn.1978); 42 U.S.C. § 405(g). Therefore, although summary judgment motions are customarily used [in social security cases], and even requested by the Court or Magistrate, such motions merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to the Court's reaching a decision on the merits." *Kenney v. Heckler*, 577 F.Supp. 214, 216 (N.D. Ohio 1983).

## III. *Evidence in the Administrative Record.*

### A. *Summary of Medical Treatment Records.*

The Administrative Record includes documentation from three treating physicians who were all orthopedic specialists and/or orthopedic surgeons. [AR 260, 585, 606.] The Administrative Record shows that plaintiff had four surgeries, three of which took place before plaintiff filed his claim for SSA benefits and one that took place shortly before plaintiff's hearing before the ALJ. First, plaintiff had carpal tunnel release surgery on his right wrist on March 7, 2012. [AR 538.] Second, on May 16, 2012, plaintiff had carpal tunnel release surgery on his left wrist. [AR 531.] Next, plaintiff had spinal surgery described in the treating physician's records as "anterior cervical diskectomies with interbody fusions at the C4-5, C5-6 levels." [AR 512.] After this surgery "failed," plaintiff had a second spinal surgery on October 7, 2014, and was allegedly still recovering from his surgery at the time of the hearing before the ALJ on January 26, 2015. [AR 33.] The following is a summary of the available records from plaintiff's three treating physicians.

#### 1. *Medical Records from Treating Physician Frederick W. Close, M.D.*

On May 11, 2009, plaintiff reported a work injury. His job at the time involved setting up and taking down scaffolding, and he typically carried planks weighing 60 or 70 pounds on his right shoulder. On the day he was injured, plaintiff reported there was a

4

1  rush to move the equipment from the work site, and he thought he pulled a muscle in his
2  neck or back. When it got worse, he went to South Coast Medical Center and was
3  evaluated by Alex Hon, M.D. [AR 258.] He was provided with medications and referred
4  to physical therapy. At this time, x-rays showed "narrowing at C5-6 disk space with
5  osteophyte formation." [AR 258.] X-rays of plaintiff's thoracic and lumbar spine also
6  showed "some slight narrowing of the disk spaces and some mild anterior osteophytes."
7  [AR 258.] Dr. Hon referred plaintiff to Frederick W. Close, M.D., for an orthopedic
8  consultation. [AR 258.]

9  Plaintiff had an initial orthopedic consultation with Frederick W. Close, M.D., on
10  June 10, 2009. He reported that he had no significant improvement in his condition with
11  physical therapy. He continued to have pain and soreness in his right chest and neck
12  area. [AR 258.] Dr. Close concluded plaintiff had a sprain of the cervical spine, thoracic
13  spine, and right shoulder and was "temporarily partially disabled." [AR 259.] In his
14  written report, Dr. Close also stated that the "heavy work may have created a chronic
15  strain . . . and aggravation of some pre-existing cervical spondylosis[2] which may be
16  causing some radicular symptoms. . . ."[3] [AR 260.] He recommended continued
17  physical therapy and pain medication. [AR 260.]

18  On June 17, 2009, Dr. Close reported that plaintiff continued to have pain and
19  requested an MRI. [AR 257.] An MRI of plaintiff's cervical spine was completed on
20  July 13, 2009, and the results state as follows: "Disc desiccation is seen at multiple levels
21  with the cervical spine. In addition, there is disk space narrowing and degenerative disc
22  disease, worst at C5-6 and C6-7, with endplate changes at C5-6. Multiple broad-based

26  [2]     "Spondylosis" refers to a degenerative disease of the spine. Merriam-Webster
27  Medical Dictionary, http://www.merriam-webster.com/medical/spondylosis.
28  [3]     "Radicular pain" is pain "involving a nerve root." Merriam-Webster Medical
   Dictionary, http://www.merriam-webster.com/dictionary/radicular#medicalDictionary.

5

1  disc-osteophyte complexes are seen at C3-4, C5-6, C6-7, and C7.  In addition, disc bulges
2  are seen in the upper thoracic spine." [AR 255.]
3        On July 20, 2009 and August 12, 2009, plaintiff was still having pain with no
4  improvement.  Dr. Close ordered an MRI of the thoracic spine.  [AR 251-252.] An MRI
5  of plaintiff's thoracic spine was completed on August 19, 2009, and the results state as
6  follows: "1. Degenerative Grade I spondylolisthesis of T11 on T12 secondary to
7  posterior facet hypertrophy.  2. At T11-12, there is broad-based disc bulge and posterior
8  facet hypertrophy which is resulting in severe right neural foraminal narrowing and likely
9  focally contacting the right T11 nerve root.  3. At T9-10, there is right paracentral/lateral
10  disc protrusion which is resulting in moderate right neural foraminal narrowing without
11  definite nerve root compression.  4. At T8-9 and T9-10, the spinal canal is congenitally
12  narrowed." [AR 250.]  On August 28, 2009, based on the MRI, Dr. Close diagnosed
13  "multi-level spondylolisthesis;"[4] recommended continued physical therapy; and told
14  plaintiff to remain off work until September 23, 2009.  [AR 248.]

15        ***2.***   ***Medical Records from Treating Physician Sidney H. Levine, M.D.***
16  ***and Related Medical Testing Records.***

17        Most of the available treating records submitted were authored by Sidney H.
18  Levine, M.D., of North County Orthopedic Medical Group, Inc.  Dr. Levine first
19  evaluated plaintiff on January 19, 2010.  At this time, plaintiff reported that he had
20  previously had an epidural steroid injection in the "cervical area." [AR 585.]  "[H]e
21  obtained little benefit from the injection in his neck" and still had "the same pain in his
22  mid back." [AR 585.]  Dr. Levine recommended that plaintiff continue with the next

23
24
25  ───────────────

26  [4]    "Spondylolisthesis" means "forward displacement of a lumbar vertebra on the one
27  below it and especially of the fifth lumbar vertebra on the sacrum producing pain by
    compression of nerve roots."  Merriam-Webster Medical Dictionary,
28  http://www.merriam-webster.com/medical/spondylolisthesis.

scheduled epidural steroid injection and continue taking Motrin as an anti-inflammatory agent." [AR 585.]

On February 18, 2010, Dr. Levine noted that plaintiff had three epidural steroid injections on January 6, 2010, January 20, 2010, and February 11, 2010. The injections "helped somewhat" and he was having "a little less pain," but his mid back pain remained constant and he also had pain into his shoulder blade. [AR 583.] Plaintiff also reported to Dr. Levine that he stopped taking 800 mg of Motrin because it was causing stomach problems. He was walking for exercise, and his range of motion was good, but there was popping in his neck. [AR 583.] Dr. Levine indicated plaintiff could return to modified work activity with no lifting, pushing, or pulling of more than 15 pounds; no excessive bending, stooping, or twisting; and no repetitive overhead activities. In addition, Dr. Levine prescribed Celebrex as an anti-inflammatory agent instead of Motrin. [AR 584.]

Dr. Levine's notes dated March 18, 2010 state that plaintiff was helped by the epidural steroid injections for about two to three weeks, but his symptoms progressively increased. [AR 581.] He had pain in the middle of his back extending into his neck; neck pain; stiffness; limited range of motion; headaches; numbness in his right upper extremity, especially when driving; and increased pain with sneezing. Dr. Levine completed a physical examination and noted there was tenderness "over the right occiput" and the "mid thoracic area," as well as "palpable muscle spasm;" and decreased sensation in the right thumb and index finger. [AR 582.] However, Dr. Levine indicated plaintiff could "carry out light work activity." [AR 582.] He instructed plaintiff to continue taking his anti-inflammatory medication and exercising at home. [AR 582.] In addition, Dr. Levine discussed surgical intervention "in the form of cervical diskectomies at the C5-6, C6-7, and C7-T1." [AR 582.]

On April 23, 2010, plaintiff reported to Dr. Levine that he no longer had any benefit from the epidural steroid injections; continued to have constant pain in his neck; had popping, grinding, stiffness, limited motion, headaches, and had pain radiating throughout his right upper extremity. [AR 579.] In the physical examination section of

16cv1603-AJB(KSC)

his notes, Dr. Levine wrote that plaintiff had decreased sensation in his right hand; tenderness in his lower cervical area with palpable muscle spasm; and limited range of motion. [AR 579.] Dr. Levine recommended surgery, because of ongoing symptoms and lack of progress with conservative medical treatment, such as physical therapy, anti-inflammatory medications, and steroid injections. [AR 580.] Dr. Levine also recommended a repeat MRI and electrical studies prior to any surgery. [AR 580.] Once again, Dr. Levine advised plaintiff that he could carry out modified work activity and assist his wife with carrying grocery bags up to 15 pounds. [AR 580.] Plaintiff said he lifted a water bottle at home which caused him to have an increase in his symptoms for several hours. [AR 580.]

As recommended by Dr. Levine, plaintiff went to the San Diego Nerve Center on May 17, 2010 for a neurological consultation and electro-diagnostic studies, which were conducted by Jonathan A. Schleimer, M.D. Plaintiff told Dr. Schleimer that he had pain throughout the day that increased with activity. He said the pain was in his right posterior scapula, upper back, and trapezius region. He also said he had intermittent numbness (paresthesia) in both hands, but the numbness was greater in his right hand, and the numbness was waking him up at night. [AR 264.] His work included repetitive motions, such as lifting, using hammers, and grabbing and carrying activities. [AR 264.] Plaintiff told Dr. Schleimer that "[i]n retrospect" he began having nocturnal and daytime numbness in his right hand a few weeks prior to his injury on May 9, 2009. [AR 264.]

Dr. Schleimer's diagnostic impression states as follows: "1. Cervical and thoracic sprain with underlying cervicothoracic spondylosis. 2. Symptomatic right greater than left bilateral carpal tunnel syndrome. 3. Chronic myofascial pain related to above." [AR 269.] According to Dr. Schleimer, the range of motion in plaintiff's cervical spine was "only minimally reduced." [AR 269.] There was no evidence of nerve compression in the neck. [AR 269.] In Dr. Schleimer's opinion, plaintiff had "symptomatic carpal tunnel syndrome, mainly on the right, and a moderately severe neuropathy at the right wrist." [AR 269.] Dr. Schleimer noted that some patients with carpal tunnel syndrome

have myofascial pain in the trapezius. It was therefore Dr. Schleimer's view that plaintiff should undergo a right carpal tunnel release procedure. [AR 269.] Essentially, Dr. Schleimer disagreed with the type of surgical intervention recommended by Dr. Levine. In his opinion, "doing a multilevel cervical fusion in patients without obvious radicular pain has about a 50% success rate." [AR 269.] For plaintiff's upper back and neck, Dr. Schleimer recommended trigger point injections and additional physical therapy. [AR 270.]

On May 25, 2010, plaintiff returned to Dr. Levine for re-examination. [AR 575.] Dr. Levine reviewed Dr. Schleimer's evaluation but noted that plaintiff does have "significant cervical disc disease most pronounced at the C5-6 and C6-7 levels with moderate foraminal narrowing at the C5-6 level on the right and moderate to severe narrowing on the left at the C7-T1 level." [AR 575.] However, because of the "extremely abnormal electrical studies," he agreed with Dr. Schleimer that plaintiff should proceed with the carpal tunnel release procedure on the right and possibly on the left depending on the results achieved on the right. [AR 575.] In a supplemental reported dated July 7, 2010, Dr. Schleimer stated that he had been asked "to address causation regarding [plaintiff's] bilateral carpal tunnel syndrome." [AR 263.] It was his opinion that the carpal tunnel syndrome was not specifically related to the injury plaintiff reported on May 9, 2009 but was "causally related to repetitive activities, *i.e.*, a cumulative trauma claim as reported between May of 2008 through May of 2009." [AR 263.]

As recommended by Dr. Levine, plaintiff had an MRI of his cervical spine completed on June 2, 2010 at California Orthopedic Institute. [AR 277.] The results state that there was "no significant interval" change since the prior MRI performed on July 12, 2009. [AR 277-278, 577-578.] However, disc bulges were noted at T2-3 and T3-4. [AR 278.]

On June 22, 2010, Dr. Levine reviewed the results of the June 2, 2010 MRI with plaintiff. [AR 573.] Dr. Levine's report states that plaintiff "continue[d] to complain of neck pain, pain extending into the shoulder blades and in the upper extremities with

9

numbness in both of his hands. He notes that he awakens at night with numbness and notes that he develops numbness with reading or driving." [AR 573.] During his physical examination of plaintiff, Dr. Levine observed that plaintiff had "decreased sensation within both hands" and positive results for carpal tunnel syndrome. [AR 574.] In Dr. Levine's opinion, plaintiff needed bilateral carpal tunnel surgery and "surgical treatment in the form of microscopically-assisted anterior cervical discectomy with partial corpectomy and decompression of the spinal cord and nerve roots at both the C5-6 and C6-7 levels." [AR 575.]

From July 20, 2010 through February 23, 2012, plaintiff had re-examination appointments with Dr. Levine on a regular basis. During these appointments, plaintiff continued to complain of neck pain extending into both upper extremities and numbness and pain in both hands that would awaken him at night. Dr. Levine's notes during this time also indicate that plaintiff had decreased sensation in both hands, limited range of motion in the neck, palpable muscle spasm and tenderness, and positive physical signs for carpal tunnel syndrome. Plaintiff was encouraged to continue his home exercise program, such as light weights and walking as tolerated. Dr. Levine prescribed pain medication and muscle relaxants. Plaintiff told Dr. Levine he was anxious to proceed with surgery. He had increased numbness in his hands with activities such as reading a book, riding a bicycle, texting, and driving. [AR 571-572, 569-570, 567-568, 565-566, 561, 559-560, 557-558, 555, 552-553, 546-547, 542-543.] On October 5, 2010, plaintiff told Dr. Levine he attempted to ride a bicycle for exercise but had to stop after five minutes because of numbness in both hands and pain radiating throughout both upper extremities. Dr. Levine's notes from this date also state that plaintiff "continues to have neck pain with radicular symptoms that have become intractable." [AR 567-568.]

According to Dr. Levine's notes dated April 27, 2012, plaintiff had carpal tunnel release surgery on his right wrist on March 7, 2012. [AR 538.] This initial surgery was completed nearly three years after plaintiff's injury on May 11, 2009. When he visited Dr. Levine on April 27, 2012, plaintiff's hand was improving with sensation coming

10

back. [AR 538.] He was encouraged to work on range of motion and general strengthening. [AR 539.]

On May 15, 2012, Dr. Levine stated in his notes that plaintiff was "much improved" following the carpal tunnel release surgery on his right wrist. He no longer had numbness in his right hand but continued to have numbness in his left hand that awakened him at night. [AR 536.]

According to Dr. Levine's notes from July 5, 2012, plaintiff had carpal tunnel release surgery on his left wrist on May 16, 2012. [AR 531.] During his visit to Dr. Levine on July 5, 2012, plaintiff still had pain in his neck and upper back. [AR 532.] He was no longer having any numbness in his hand but the base of his palm was sore, especially when gripping, and he was attending physical therapy. [AR 531.]

On August 23, 2012, "three months post carpal tunnel surgery on the left," Dr. Levine reported in this notes that plaintiff no longer had tingling and numbness in his hands and felt like his strength was improving. However, he continued to have pain into his right trapezius and shoulder. [AR 529.] Dr. Levine recommended that plaintiff undergo another MRI study since the prior one was almost three years old. [AR 530.]

On October 11, 2012, Dr. Levine re-examined plaintiff and reviewed the results of a new MRI of plaintiff's cervical spine. [AR 520.] At this time, plaintiff continued to have pain in his neck, right shoulder, trapezius, right scapula, and upper arm. [AR 520.] The results of the MRI completed on October 11, 2012 state as follows:

> 1) C5-6 and C6-7 early spondyloarthropathy with posterior central and right paracentral spondylotic bars and right uncovertebral osteophytes. Mild impingement on the right ventral hemicord at C5-6. Mild right C5-6 and C6-7 foraminal stenosis.
> 2) Posterior central 2 mm C3-4 disc bulge.
> 3) Posterior central 1 mm C4-5 disc bulge.

[AR 521.]

Based on plaintiff's ongoing symptoms, particularly the "radicular pain into the right upper extremity . . . ," and the results of the MRI, Dr. Levine once again

16cv1603-AJB(KSC)

recommended that plaintiff "undergo microscopically-assisted anterior cervical discectomy with spinal cord and nerve root decompression, interbody fusion and anterior plate fixation at the C5-6 and C6-7 levels." [AR 521.] Dr. Levine's notes say he discussed the surgery with plaintiff "in great detail on numerous occasions." [AR 521.] Plaintiff was "anxious and desirous of proceeding with surgery." [AR 521.]

On December 3, 2012, Dr. Levine reported that plaintiff had been "approved to undergo anterior cervical discectomy at the C5-6 and C6-7 levels with spinal cord and nerve root decompression along with interbody fusion and anterior plate fixation." [AR 517.] Next, Dr. Levine's notes from January 29, 2013 state that plaintiff was scheduled to be admitted to Scripps Memorial Hospital on January 31, 2013 to have this surgery. [AR 514.] At this time, Dr. Levine reviewed the results of X-rays completed on January 29, 2013, which state as follows: "There is reversal of the normal cervical lordotic curvature. There is ossification in the area of the anterior longitudinal ligament between C5-6 and C6-7. There is moderate narrowing of the C6-7 intervertebral disc space and marked narrowing of the C6-7 neural foramina. There is moderate narrowing of the C5-6 neural foramina." [AR 515.]

On February 4, 2013, plaintiff was re-examined by Dr. Levine following his "anterior cervical diskectomies with interbody fusions at the C4-5, C5-6 levels." [AR 512.] Although plaintiff reported that his neck felt "quite good," he complained of intermittent pain in his right upper extremity with numbness in his thumb, index, and long fingers. [AR 512.] Plaintiff was given prescriptions for pain medications. [AR 513.]

On February 8, 2013, plaintiff was re-examined by Dr. Levine following his surgery and indicated he was having a little less pain in his arm but had numbness in this thumb, index, and radial half of his long finger. [AR 510.] Plaintiff was advised to continue taking his pain medication. [AR 511.]

During a re-examination by Dr. Levine on February 15, 2013 following his "anterior interbody fusions at C5-6 and C6-7 levels," plaintiff reported pain and

12

numbness in his thumb, index, and long fingers and palm. He was having difficulty sleeping because of the pain. [AR 508.] Dr. Levine recommended re-evaluation by a neurologist, including electrical studies. Plaintiff was advised to continue with pain medications. [AR 509.]

As noted above, plaintiff applied for SSA disability and supplemental security income benefits on February 25, 2013. [AR 153-169.]

On March 4, 2013, Dr. Levine stated in his notes that plaintiff complained of pain from his elbow that extended into his forearm and shoulder, weakness, and difficulty sleeping. [AR 506.] Plaintiff was given a prescription for Lortab to address pain and told to apply moist compresses to his neck. [AR 507.]

Next, on March 18, 2013 plaintiff told Dr. Levine that he had a burning-like sensation in the tips of his index and long finger and his right thumb, along with pain throughout his upper extremity that shoots up from his hand into his forearm, upper arm, and right shoulder blade. Although his neck motion was improving, he experienced pain with lateral bending to the right. Dr. Levine advised plaintiff to take his pain and anti-inflammatory medications, use his electrical stimulator, and start physical therapy. [AR 505.]

On April 19, 2013, plaintiff had x-rays taken that were reviewed by Dr. Levine, who stated in his notes that it was "difficult to determine whether or not there is some encroachment upon the C6-7 neuro-foramen." [AR 502.] Plaintiff told Dr. Levine he had pain extending up his forearm and upper arm into his right shoulder. He also said he had pain in his right hand, especially within the palm, and into the fingertips of his thumb, index, and long fingers. [AR 501.] Dr. Levine indicated he was awaiting "electrical studies by Dr. Wang." [AR 503.]

As mentioned by Dr. Levine, Shen Ye Wang, M.D., a neurologist, completed an electromyography and a nerve conduction study of plaintiff's "bilateral upper extremities" on May 1, 2013. [AR 607.] Plaintiff told Dr. Wang that he was having radiating pain and numbness in his right upper extremity and intermittent numbness and

16cv1603-AJB(KSC)

tingling of the fingers of the right hand. He also felt that his right arm was weaker. [AR 607.] A needle exam showed denervation in several areas "consistent with C6-7 cervical motor radiculopathy" on the right side only. On the left side, the results were "completely normal." [AR 607.] The results of the median nerve motion conduction study were consistent with mild carpal tunnel syndrome bilaterally. [AR 607-608.] Dr. Wang also stated in her report that: "There is no definite electrical evidence of an ulnar neuropathy across the wrists or elbows. There is no underlying peripheral neuropathy." [AR 608.]

On December 6, 2013, at the request of Dr. Levine, Imaging Healthcare Specialists completed a cervical myelogram and CT scan of plaintiff's cervical spine. [AR 614.] The following conclusion is included in the report: "Status post anterior cervical interbody fusion C5-C7. Interbody graft protrudes into the right C5-C6 and C6-C7 neural foramina likely impinging the exiting right C6 and C7 nerve roots. Mild central spinal stenosis C5-C6 with mass effect on the right side of the cervical spinal cord. Findings are indeterminate in age." [AR 615.]

On March 11, 2014, at the request of Dr. Levine, an MR angiogram of the neck (carotid arteries) was also completed by Imaging Health to address "[n]eck pain with radiculopathy." [AR 613.] The results showed "[n]o significant stenosis." [AR 613.] This appears to be the final treating record related to Dr. Levine.

### 3. *Medical Records from Treating Physician Jerome C. Hall, M.D.*

On or about July 1, 2014, Jerome C. Hall, M.D., signed a form entitled Primary Treating Physician's Progress Report. [AR 606.] The section of the report entitled Treatment Plan states that plaintiff may require decompression fusion. This section of the form also states "second opinion with Dr. Kureshi" and "pain management to take over medications." [AR 606.] The work status section of the form states that plaintiff should remain off work for 45 days commencing July 1, 2014. [AR 606.]

Dr. Hall signed two other forms on December 18, 2014. The first form states that plaintiff's diagnosis is "anterior/posterior decompression fusion C5-6 C6-7." [AR 617.]

14

1 This form also states that plaintiff's condition causes pain and limits function in his upper

2 extremities, that he could never engage in pushing/pulling activities, and that he could

3 rarely engage in fine manipulative activities such as writing or typing, or in gross

4 manipulative activities such as handling or grasping. [AR 617.] The second form dated

5 December 18, 2014 is entitled Physical Capacities Evaluation, and it states that plaintiff

6 could only stand, sit, or walk for one hour at a time or for two hours in an eight-hour

7 work day. The form also states that plaintiff could only lift 6 to 20 pounds occasionally,

8 could not use his hands for simple grasping, pushing/pulling, and fine manipulation and

9 could not bend, squat, crawl, climb, or reach. In addition, the form states that plaintiff

10 should be restricted from activities involving unprotected heights, machinery,

11 temperature changes, driving, and exposure to dust, fumes, or gases. [AR 618.] The

12 record does not include any treatment records from Dr. Hall.

13     **B.**    ***Summary of Examining Physicians' Reports.***

14     The Administrative Record includes a number of reports by examining physicians,

15 because plaintiff was injured at work and pursued a claim for worker's compensation

16 benefits. All of these examinations were completed before plaintiff had any of his four

17 surgeries and before he filed his claim for benefits under the SSA.

18     *1.*    ***Examining Physician William S. Adsit, M.D.***

19     On September 21, 2009, about four months after his injury, plaintiff went to the

20 California Orthopedic Institute for an independent medical examination, which was

21 completed by William S. Adsit, M.D., an orthopedic surgeon, to address causation and

22 treatment. [AR 290.] Because plaintiff was still experiencing pain from his work injury,

23 Dr. Adsit recommended pain medications, more active participation in physical therapy

24 to restore strength and function and to re-establish a full range of motion. Based on MRI

25 results, it was Dr. Adsit's view that plaintiff had "some pain referred to his neck, upper

26 back and shoulder and [might] be a candidate for some epidural steroids in his cervical

27 spine to try to calm down those pain generators. . . ." [AR 289.] It was also Dr. Adsit's

28 view that "additional resting or passive modalities of treatment" would not be beneficial,

15

1  and plaintiff should "remain in a modified duty status, precluded from lifting over 15
2  pounds with his right upper extremity or overhead work with his right upper extremity."
3  [AR 289.]

4         2.    ***Examining Physician Larry D. Dodge, M.D.***

5         About a year after his injury, plaintiff was examined on April 14, 2010 by Larry D.
6  Dodge, M.D., of San Diego Orthopedic Associates Medical Group, Inc. [AR 307.]
7  Dr. Dodge interviewed plaintiff, completed an extensive review of plaintiff's medical
8  records, and conducted a "specialty examination." [AR 307.]

9         In his written report, Dr. Dodge reached several conclusions. First, his diagnostic
10  impression was that plaintiff had cervical and thoracic strain and disc disease, as well as
11  cervical spinal stenosis with a "complete absence of radiculopathy." [AR 315.] Second,
12  it was Dr. Dodge's opinion that plaintiff had "reached a point of maximum medical
13  improvement," because he had "clearly exhausted all reasonable conservative measures"
14  and was "not considered a candidate for operative intervention." [AR 315.] Third, Dr.
15  Dodge made the following "objective findings": "1. Normal neurological examination.
16  2. MRI of the cervical spine of 7/13/09 disclosing degenerative disc disease at C5-C6 and
17  C6-C7 with variable degrees of foraminal narrowing. 3. MRI of the thoracic spine of
18  May 19, 2009, disclosing degenerative disc disease and degenerative arthritis." [AR
19  315.]

20         Fourth, Dr. Dodge concluded that plaintiff had "experienced more pain and
21  disability than other patients with similar injuries because of pre-existing pathology" (*i.e.*,
22  degenerative disc disease, which is mostly related to heredity). [AR 317.] Fifth, it was
23  the view of Dr. Dodge that plaintiff was "a qualified injured worker" who should be
24  allowed to proceed with re-training. [AR 317.] Sixth, Dr. Dodge agreed with Dr. Close
25  and Dr. Adsit that plaintiff did not need any surgical intervention, because he had "no
26  neurological symptoms and no neurological signs." [AR 318.] In other words,
27  Dr. Dodge disagreed with the opinion of plaintiff's treating physician, Dr. Levine, that
28  plaintiff needed "three-level fusion" surgery. [AR 318.]

Finally, on October 18, 2010, Dr. Dodge prepared a supplemental evaluation. [AR 299.] Dr. Dodge's reports states that he reviewed "further medical records . . . including [plaintiff's] pain diagram" and concluded he "has an arthritic neck" and "has arthritis in multiple levels of the neck" spanning "from C3, and in some reports, down through T1." [AR 299, 301.] In the opinion of Dr. Dodge, "major spinal surgery" in plaintiff's case "makes no medical sense." [AR 301.] In part, Dr. Dodge's report includes the following reasoning for his opinion: "To . . . bring the patient to surgery for a 'corpectomy' at two levels in the neck, when he has absence of radiculopathy, normal electro-diagnostic testing, and one is not addressing his multilevel arthritic disease, makes no medical sense. Fusions are not performed whether it would be in the cervical or the lumbar spine to treat axial pain from arthritic disease." [AR 301-302.] Dr. Dodge's report further states as follows: "It remains my medical opinion with respect to Dr. Levine, I consider his proposition for his cervical corpectomy and fusion to be unreasonable and unnecessary." [AR 302.]

### 3. *Examining Physician L. Randall Mohler, M.D.*

On February 15, 2011, almost two years after his work injury, plaintiff was examined by L. Randall Mohler, M.D., an orthopedic surgeon specializing in surgery of the hand. In a written report, Dr. Mohler addressed causation and treatment of "bilateral median neuropathy" (*i.e.*, carpal tunnel syndrome) in plaintiff's wrists. Dr. Mohler recommended that plaintiff splint his wrists at night while sleeping to diminish nocturnal symptoms. It was also Dr. Mohler's view that carpal tunnel release surgery would substantially improve or alleviate plaintiff's symptoms. [AR 383-389.]

### 4. *Examining Physician Jose J. Senador, M.D.*

On April 20, 2011, about two years after his work injury, plaintiff was examined by Jose J. Senador, M.D., an orthopedic surgeon. Dr. Senador prepared a detailed report of his clinical findings on August 16, 2011. [AR 322, 348.] Based on a physical examination and a review of plaintiff's medical records, Dr. Senador agreed with the recommendation for a carpal tunnel release procedure. For plaintiff's continuing neck

16cv1603-AJB(KSC)

pain, Dr. Senador recommended a referral to a pain medicine specialist rather than surgical intervention, because his physical examination indicated there were no "radiculopathic symptoms." [AR 343-344.] With regard to plaintiff's upper back pain, Dr. Senador concluded that no further treatment was necessary as plaintiff had reached maximum medical improvement. However, "for acute exacerbation," Dr. Senador said plaintiff should have access to trigger point injections, pain management, physical therapy, and/or acupuncture. [AR 344, 345.] It was Dr. Senador's view that plaintiff should not work in a job that involves repeated or prolonged bending of his trunk, repeated or forceful use of his upper right extremity, repeated or prolonged reaching over or reaching backward repetitively with the right upper extremity, and lifting or handling loads heavier than 20 pounds. [AR 344.]

### 5. *Examining Physician Richard M. Braun, M.D.*

On October 26, 2011, plaintiff was examined by Richard M. Braun, M.D., for evaluation and future treatment of his "claimed bilateral carpal tunnel syndrome." [AR 362.] Following his examination and review of plaintiff's medical records, Dr. Braun noted there were somewhat conflicting opinions about plaintiff's hand symptoms and the cause of those symptoms. [AR 377-378.] However, it was Dr. Braun's view that plaintiff's symptoms were related to his former job but wax and wane because he has not been working. If he returned to "strenuous use of his hands," Dr. Braun believed that plaintiff's symptoms would increase within a relatively short period of time. [AR 379.] Dr. Braun agreed that plaintiff was "a reasonable candidate for decompression of the carpal tunnel in the right wrist." [AR 380.] If this procedure resulted in improved symptoms, he would consider the same treatment for plaintiff's left wrist. According to Dr. Braun, it would take about six months for plaintiff to recover from the surgery and regain his grip strength. [AR 381.] As noted above, plaintiff had carpal tunnel release surgery on his right wrist on March 7, 2012 [AR 538-539] and on his left wrist on May 16, 2012 [AR 531].

///

16cv1603-AJB(KSC)

## C. **_Summary of Non-Examining, Reviewing Physicians' Reports._**

The Administrative Record includes two reports by reviewing physicians that were prepared after plaintiff's carpal tunnel surgery and after his first spinal surgery but before his second spinal surgery on October 7, 2014.

### 1. **_Non-Examining Physician George G. Spellman, M.D._**

On June 4, 2013, George G. Spellman, M.D., reviewed plaintiff's medical records and completed two forms entitled: (1) Disability Determination Explanation; and (2) Case Analysis. [AR 44-60.] Dr. Spellman's Case Analysis states that he considered whether plaintiff met Listing 1.02, major dysfunction of a joint or joints due to any cause.[5] Based on his review of plaintiff's medical records, Dr. Spellman concluded that plaintiff was not disabled and could lift 20 pounds occasionally and 10 pounds frequently; stand, sit, and/or walk for about 6 hours in an 8-hour day; push and/or pull,

---

[5] Listing 1.02 is "[c]haracterized by gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." 20 C.F.R. Part 404, Subpart P, Appendix 1. The definition in 1.00B2b is not relevant, but the definition in 1.00B2c states as follows: "Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." C.F.R. Part 404, Subpart. P, Appendix 1.

including operation of hand and/or foot controls, on an unlimited basis; balance, stoop or bend, crouch, crawl, kneel, and climb stairs or ladders occasionally; and did not have any manipulative, visual, communication, or environmental limitations. [AR 51.] Dr. Spellman also concluded based on plaintiff's medical records that he did not have the residual functional capacity to return to his past jobs but did have the capacity to do light work. [AR 52-53.] Although Dr. Spellman concluded that plaintiff's impairments could reasonably produce disabling pain or other symptoms, he found that plaintiff's statements about his symptoms were only partially credible based on the following conclusory factors: "The location, duration, frequency and intensity of the individual's pain and other symptoms; precipitating and aggravating factors; medication treatment; treatment other than medication; [and] other measures to relieve symptoms." [AR 61.]

### 2. *Non-Examining Physician David Braverman, M.D.*

On December 26, 2013, David Braverman, M.D., reviewed plaintiff's medical records and completed two forms entitled: (1) Disability Determination Explanation (Reconsideration Level); and (2) Case Analysis. [AR 68-76.] Similar to Dr. Spellman, Dr. Braverman's Case Analysis states that he considered whether plaintiff met Listing 1.02, major dysfunction of a joint or joints due to any cause. [AR 72.] Based on his review of plaintiff's medical records, Dr. Braverman concluded that plaintiff was not disabled and could lift 20 pounds occasionally and 10 pounds frequently; stand, sit, and/or walk for about 6 hours in an 8-hour day; push and/or pull, including operation of hand and/or foot controls on an unlimited basis; balance, stoop or bend, crouch, crawl, kneel, and climb stairs or ladders occasionally; and did not have any manipulative, visual, communication, or environmental limitations. [AR 73-74.] Dr. Braverman also concluded based on plaintiff's medical records that he had the capacity to do light work, even though plaintiff had surgery in January 2013, because there were no new impairments, and no new allegations of worsening or test results that would justify a different conclusion. [AR 72, 74-76.] In addition, Dr. Braverman noted that: "[Plaintiff] has not received any further treatment." [AR 72.] Although Dr. Braverman concluded

1  that plaintiff's impairments could reasonably produce pain or other disabling symptoms,
2  he found that plaintiff's statements about his symptoms were only partially credible.  In
3  support of this finding, Dr. Braverman cited the same conclusory factors as Dr. Spellman.
4  [AR 73.]

### D.  *Administrative Hearing Held on January 26, 2015.*

6  Plaintiff was represented by counsel at the hearing on January 26, 2015.  [AR 31-
7  32.]  At the outset of the hearing, the ALJ asked plaintiff's counsel if he had any
8  objections to the documents being admitted (Exhibits 1A to 13F) and whether he had or
9  was aware of any other documents.  [AR 32.]  Counsel indicated he had no objection to
10  any of the exhibits, did not have any other documents, and was not aware of any other
11  documents.  [AR 32.]  In an opening statement, counsel stated that plaintiff suffered a
12  cervical spine injury, had a spinal fusion, and had to have a second surgery on his spine
13  on October 7, 2014.  At the time of the hearing, counsel indicated plaintiff was still
14  recovering from this second surgery.  [AR 33.]

### 1.  *Plaintiff's Testimony.*

16  Plaintiff testified that he was 45 years old and had last worked in 2009.  He
17  stopped working because of an injury he suffered at work while "carrying too much
18  weight on [his] right side."  [AR 34, 37.]  The injury was worse the next day, so he went
19  to the hospital and learned that he had "suppressed [his] spine."  [AR 34.]

20  Plaintiff is able to drive to doctor's appointments.  [AR 35.]  Although he is able to
21  get dressed on his own, he needs help tying his shoes.  [AR 35.]  He can also button his
22  shirt, feed himself, and brush his teeth.  [AR 35.]  He lives with his wife and adult
23  stepson.  At this time, he does not do any of the housework, because it causes pain in his
24  neck.  [AR 35-36.]  He spends his days waiting to get better.  The doctors told him to
25  just "kick back" and not do anything until he is healed.  [AR 36.]  Plaintiff watches
26  television but is not able to read because he cannot hold a book up for very long.  [AR
27  37.]

28  / / /

1             **2.**    _**Vocational Expert's Testimony/Mark Remas.**_

2        Based on the record available to him, Mark Remas, a vocational consultant [AR

3 122-123], testified in response to questions by the ALJ that plaintiff had worked as a

4 shipping and receiving clerk, which is considered medium, skilled work, and as a

5 painter/laborer in a shipyard, which is considered medium, semi-skilled work. [AR 39.]

6 If plaintiff was limited to light work, he would no longer be able to perform any of this

7 past relevant work. [AR 39-40.] However, there would be other work available for a

8 person with plaintiff's age, education, and work experience who was limited to light

9 work and only occasional postural activities, no repeated or prolonged bending, forceful

10 gripping, vibrating tools, or overhead and backward reaching. [AR 39-40.] Mr. Remas

11 cited examples of two semi-skilled, light jobs that are available in significant numbers:

12 shipping checker (a semi-skilled position) and mail clerk (an unskilled job). [AR 40.]

13 On the other hand, Mr. Remas testified there would not be a significant number of jobs

14 available in the national economy for an individual of plaintiff's age, education, and work

15 experience who was further limited to sedentary work with "only occasional handling and

16 fingering with the dominant right hand." [AR 41.]

17        Next, plaintiff's counsel asked Mr. Remas whether an individual with the

18 limitations described in "the treating surgeon's report" could "engage in any work as it's

19 performed in the competitive work environment," and Mr. Remas said, "No." [AR 42.]

20 Presumably, plaintiff's counsel was referring to the forms completed by Dr. Hall on

21 July 1, 2014 and December 18, 2014. [AR 606, 617-618.] Essentially, these forms state

22 that because of the fusion surgery, plaintiff was only capable of handling and fingering

23 up to 16 percent or one-sixth of the workday; could not lift more than 10 pounds; or sit,

24 stand, and walk in combination for 6 hours of an 8-hour day. [AR 41-42.]

25 **III.**    _**The ALJ's Five-Step Disability Analysis.**_

26        To qualify for disability benefits under the SSA, an applicant must show that he or

27 she is unable to engage in any substantial gainful activity because of a medically

28 determinable physical or mental impairment that has lasted or can be expected to last at

least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five step sequential evaluation for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d at 1193, 1194.

At step one, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). Here, the ALJ concluded plaintiff has not engaged in "substantial gainful activity" since May 9, 2009, the date of his alleged work injury. [AR 12.]

At step two, the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). For example, a slight abnormality or combination of slight abnormalities that only have a minimal effect on the applicant's ability to perform basic work activities will not be considered a "severe" impairment. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). Examples of basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(1) (6). "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled." *Webb v. Barnhart*, 433 F.3d at 686. In this case, the ALJ concluded at step two that plaintiff has the following severe impairments: "degenerative disc disease, carpal tunnel syndrome, and obesity." [AR 12.]

If there is a severe impairment, the ALJ must then determine at step three whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a Listing,

16cv1603-AJB(KSC)

he or she must be found disabled. *Id.* Here, the ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or equals the severity in the Listing of Impairments. [AR 12.] Plaintiff does not specifically challenge this finding.

If an impairment does not meet or equal a Listing, the ALJ must make a step four determination of the claimant's residual functional capacity based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). "Residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the applicant cannot perform past relevant work, the ALJ at step five must consider whether the applicant can perform any other work that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

Here, the ALJ concluded at step four that plaintiff does not have the residual functional capacity to perform his past relevant work. [AR 20.] However, it was the ALJ's conclusion that plaintiff does have the residual functional capacity to perform light work with occasional postural activities and no repeated prolonged bending, no forceful gripping or use of vibrating tools with the upper right extremity, and no repetitive reaching overhead or backward. [AR 13.] Based on plaintiff's age, education, work experience, and the testimony of the vocational expert, the ALJ further concluded at step five that plaintiff could perform a significant number of jobs available in the national economy. [AR 20-21.] As a result, the ALJ found that plaintiff is not disabled under SSA regulations. [AR 21.] As addressed more fully below, plaintiff disagrees with the ALJ's findings at steps four and five, and he therefore argues that the Court should remand the case for additional evidence or grant a reversal with an instruction for the payment of benefits. [AR 10-1, at pp. 20-26.]

1 | /// 
2 | /// 
3 | *IV.* *Sufficiency of the Evidence.*
4 |       In his Motion for Reversal and/or Remand, plaintiff argues that his treating
5 | physician, who performed a second spinal surgery on October 7, 2014, shortly before the
6 | hearing on January 26, 2015, was in the best position to give an opinion about his
7 | medical condition and functional capacity. Plaintiff contends the ALJ erroneously
8 | rejected this treating physician's opinion in favor of the opinions of non-treating,
9 | reviewing doctors who did not have the benefit of a complete record. Plaintiff also
10 | argues that the ALJ breached his duty to "further develop the record" by failing to obtain
11 | the most recent clinical records from his treating physician, because they were the "most
12 | probative" of his condition. [Doc. No. 10-1, at pp. 22-24.] In support of this position,
13 | plaintiff cites the Ninth Circuit's decision in *Young v. Heckler*, 803 F.2d 963, 968 (9th
14 | Cir. 1986), which states in part as follows: "Where a claimant's condition is
15 | progressively deteriorating, the most recent medical report is the most probative." *Id.* at
16 | 968.
17 |       In the Motion for Summary Judgment and Opposition to plaintiff's Motion,
18 | defendant argues that the ALJ properly resolved all conflicts in the medical evidence and
19 | provided convincing reasons for rejecting the opinion of plaintiff's treating physician.
20 | [Doc. No. 13-1, at pp. 3-8.] Defendant also contends that the ALJ fulfilled his duty to
21 | develop the record, because the ALJ specifically asked plaintiff's counsel at the
22 | administrative hearing whether there were any other documents, and he replied, "No."
23 | [Doc. No. 13-1, at p. 6.] In addition, defendant contends that the ALJ's duty to further
24 | develop the record is only triggered when there is ambiguous evidence or when there is
25 | insufficient evidence to allow for a proper evaluation. In defendant's view, the record in
26 | this case includes "numerous other pieces of medical evidence that support the ALJ's
27 | non-disability conclusion," and this evidence "contradicts [the treating physician's]
28 | extreme and inadequately supported opinion." [Doc. No. 13-1, at p. 6.]

25

With respect to evidence obtained from physicians, the Ninth Circuit makes distinctions "among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. [Citation omitted.] At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons. [Citation omitted.] [The Ninth Circuit has] also held that 'clear and convincing' reasons are required to reject the treating doctor's ultimate conclusions. [Citation omitted.] Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing. [Citation omitted.]" *Id.* On the other hand, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).[6]

Factors to be considered in evaluating the opinion of a treating physician include the length of the treatment relationship; the frequency of examination; the nature and

---

[6] *See also* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.")

extent of the treatment relationship; the extent to which the opinion is supported by relevant evidence and consistent with the record as a whole; and whether the treating physician is a specialist in a particular disability at issue. 20 C.F.R. § 404.1527(c).

Even when a claimant is represented by counsel, an ALJ has a special duty to fully and fairly develop the record to ensure that the claimant's interests are considered. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).

In *Smolen v. Chater*, 80 F.3d at 1273, for example, the ALJ rejected opinions by one of the claimant's treating physicians that were presented in letters and in responses to four questions posed by the claimant's counsel. *Id.* at 1285-1288. The treating physician did not provide comments to support his answers to the attorney's questions and did not testify at the hearing. *Id.* at 1288. One of the ALJ's reasons for rejecting the opinions of the treating physician was that his responses were not accompanied by supporting comments. As a result, the ALJ did not know the basis for the physician's opinions and "thought they might have been based on unwarranted assumptions." *Id.* Even though the claimant was represented by counsel, the Ninth Circuit held that the ALJ had a "special duty to fully and fairly develop the record" by conducting an appropriate inquiry. *Id.* The Ninth Circuit suggested that the ALJ should have contacted the treating physician to submit further questions to discover the basis for the opinions in order to appropriately evaluate them. To do so, the Ninth Circuit stated that the ALJ could have continued the hearing to augment the record. *Id.*

As noted above, counsel stated at the January 26, 2015 hearing that plaintiff had a second spinal fusion surgery on October 7, 2014, just three months before the hearing, because the prior surgery on his spine failed. [AR 33.] Counsel also stated that plaintiff was "still recovering" from the surgery, and it was uncertain whether the second surgery would result in medical improvement. [AR 33.] Counsel referred the ALJ to Medical Source Statements "from a board certified specialist indicating" plaintiff's condition at the time was "less than sedentary." [AR 33.] In addition, plaintiff testified that the doctor told him to "kick back and not do anything" until he was healed. [AR 36.] Although plaintiff testified he was able to drive to doctor's appointments, button his shirt, and dress and feed himself, he said he needed help tying his shoes and could not do repetitive tasks, such as washing dishes, without pain. [AR 35-36.]

The ALJ's decision acknowledges that plaintiff was "currently treating with Jerome Hall, M.D., but [also states that] Dr. Hall's records have not been produced. Instead, the record contains [only] two Medical Source Statements from Dr. Hall (12F; 13F). . . ." [AR 17.] From the record, it is unclear whether any other records were requested from Dr. Hall by the ALJ or plaintiff's counsel. Since the final treatment record from plaintiff's previous treating physician, Dr. Levine, is dated March 11, 2014 [AR 613], and the hearing before the ALJ took place on January 25, 2015 [AR 29, 124], it is possible that the Administrative Record is missing about nine months' worth of highly relevant treatment records. To the extent they exist, these records would have been created: (1) after plaintiff's first spinal surgery in January 2013; (2) during the time leading up to the second spinal surgery; and (3) following the second spinal surgery on October 7, 2014.

The Medical Source Statements referenced in the ALJ's decision consist of two forms completed by Dr. Hall: (1) a one-page Primary Treating Physician's Progress Report dated July 1, 2014; and (2) a two-page Physical Capacities Evaluation dated December 18, 2014. [AR 17, 606, 617-618.] Dr. Hall completed the Physical Capacities Evaluation form about two months after plaintiff's second spinal surgery. The responses

on the form indicate that plaintiff's ability to perform basic work activities was severely limited; that his condition limited function in the use of his upper extremities; that he was "rarely" able to engage in fine or gross manipulative activities, such as finger, typing, writing, handling, or grasping; and that he was "rarely" able to engage in pushing or pulling activities. [AR 617-618.] The vocational expert testified that competitive work would not be available to an individual of plaintiff's age, education and work experience who was limited to sedentary work with only occasional handling and fingering with the dominant right hand. [AR 39-40.] In addition, the vocational expert also testified that no competitive work would be available to an individual with the limitations reflected in "the treating surgeon's report." [AR 41-42.]

The ALJ's decision concludes in part as follows: "The opinions of the treating and examining sources are accorded partial weight. . . . The undersigned accords no weight to Dr. Hall's recommendations since there are no supporting clinical records to support his significant limitations and because his opinion is not consistent with the numerous other opinions of record." [AR 19.] Instead, without giving a reason, the ALJ afforded "great weight" to the opinions of non-examining, reviewing physicians who concluded based on the available medical records that plaintiff could perform light work with some restrictions. [AR 19.] In this Court's view, the ALJ did not provide clear and convincing or legitimate reasons for giving "great weight" to the reviewing physicians' opinions and "no weight" to Dr. Hall's opinions without further development of the Administrative Record.

First, as noted above, the ALJ had the burden of proof at step five of the disability analysis to establish that plaintiff had the residual functional capacity to perform a significant number of jobs in the national economy. *Celaya v. Halter*, 332 F.3d at 1180. As plaintiff contends, Dr. Hall's opinions, as well as any explanatory treatment records from Dr. Hall, would have been the "most probative" to the ALJ's disability analysis at step five. [Doc. No. 10-1, at pp. 22-24] Dr. Hall was not only plaintiff's treating physician/surgeon when the second spinal surgery was completed on October 7, 2014,

1  shortly before the January 26, 2015 hearing, but the vocational expert testified at the

2  hearing that an individual of plaintiff's age, education and work experience would not be

3  employable at step five if Dr. Hall's conclusions were credited. [AR 41-42, 606, 617-

4  618.]

5          Without additional records or information from Dr. Hall, it is this Court's view that

6  the record was not adequate for the ALJ to complete a "proper evaluation of the

7  evidence." *Mayes v. Massanari*, 276 F.3d at 459-460. Under very similar circumstances,

8  the Ninth Circuit in *Smolen v. Chater*, 80 F.3d at 1273, held that the ALJ had a "special

9  duty to fully and fairly develop the record" and should have contacted the treating

10 physician for additional information to discover the basis for the physician's opinions.

11 *Id.* at 1285-1288. In other words, under the circumstances presented, the absence of

12 "supporting clinical records" is not a clear and convincing or legitimate reason to give

13 "no weight" to the opinions expressed by Dr. Hall in the Physical Capacities Evaluation

14 form he completed on December 18, 2014. In this Court's view, the circumstances

15 required the ALJ to contact Dr. Hall in an attempt to further develop the Administrative

16 Record to include any supporting treatment documents and/or the basis for the opinions

17 expressed by Dr. Hall in the Physical Capacities Evaluation form he completed on

18 December 18, 2014.

19         Second, the record does not support the ALJ's conclusion that Dr. Hall's

20 recommendations should be afforded "no weight" because they were "not consistent with

21 the numerous other opinions of record." [AR 19.] As the ALJ noted in his decision,

22 there appeared to be a consensus among the treating, examining, and reviewing

23 physicians, that plaintiff could not return to his past relevant work but was capable of

24 some level of light work. [AR 19.] However, all of these other opinions of record,

25 including the opinions of the reviewing physicians to which the ALJ afforded "great

26 weight" [AR 19], were completed before plaintiff's second spinal surgery on October 7,

27 2014. Thus, as plaintiff contends, these opinions were all based on an incomplete record.

28 [AR 24.] As a result, the value of these other opinions at the time of the January 26, 2015

Administrative Hearing was at least questionable in light of several factors. These factors include the alleged failure of plaintiff's first spinal surgery in January of 2013 [AR 520-615]; the second, superseding spinal surgery on October 7, 2014 [AR 33]; undisputed indications in the record that plaintiff had not fully recovered from this second spinal surgery at the time of the hearing before the ALJ on January 26, 2015 [AR 33, 36]; and incomplete documentation from Dr. Hall. As plaintiff's counsel stated during the hearing, "we're hoping that the second surgery . . . will result in medical improvement," but "[h]e's certainly not there yet." [AR 33.]

Based on the foregoing, it is this Court's view that the ALJ's non-disability determination at step five of the five-step disability analysis is not supported by substantial evidence, because the record is incomplete, and, as set forth by the Ninth Circuit in *Smolen v. Chater*, 80 F.3d 1273, the ALJ had a duty to further develop the record to include the most recent treating records related to plaintiff's second spinal surgery and/or to discover the reasons why Dr. Hall indicated on the December 18, 2014 Physical Capacities Evaluation form that plaintiff's functional capacity was severely limited.

"Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1235 (9th Cir. 2011). Remand is also appropriate where the circumstances "show a substantial likelihood of prejudice." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

Here, it appears that further development of the Administrative Record to include Dr. Hall's treatment records, if any, for the time period in question and/or an explanation by Dr. Hall as to the bases for his responses to the questions in the Physical Capacities Evaluation form could have resulted in a more favorable outcome of plaintiff's claim for disability and/or supplemental security income benefits. In other words, without further development of the record, this Court cannot conclude the ALJ's decision is supported by

16cv1603-AJB(KSC)

substantial evidence. As a result, it is RECOMMENDED that the District Court remand this matter for further development of the record. In this regard, Dr. Hall should be contacted to determine whether treatment records are available for the time period in question (*i.e.*, March 2014, when it appears plaintiff was last treated by his former treating physician, Dr. Levine, through January 26, 2015, when the hearing was held before the ALJ), and whether Dr. Hall is able to explain his reasons for the responses he provided on the above-referenced Medical Source Statements [AR 617-618.]. The ALJ's non-disability determination at step five should be re-considered if Dr. Hall is able to provide any additional documentation relevant to plaintiff's disability claim.

## V. *Conclusion.*

Based on a thorough review of the Administrative Record and for the reasons outlined above, IT IS RECOMMENDED that the District Court REMAND this matter for further development of the record and reconsideration of the ALJ's non-disability determination at step five of the ALJ's five-step disability analysis.

IT IS FURTHER RECOMMENDED THAT THE DISTRICT COURT:

1. GRANT plaintiff's Motion for Remand [Doc. No. 10];

2. DENY defendant's Motion for Summary Judgment [Doc. No. 13]; and

3. ENTER judgment in plaintiff's favor.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d). Within fourteen (14) days after being served with a copy of this Report and Recommendation, "any party may serve and file written objections." 28 U.S.C. § 636(b)(1)(B)&(C). The document should be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within this

/ / /

/ / /

/ / /

/ / /

16cv1603-AJB(KSC)

specific time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

Dated: August 11, 2017

Hon. Karen S. Crawford
United States Magistrate Judge